******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MALCOM ELTON DUKES
## (AC 48115)

Alvord, Suarez and Seeley, Js.

*Syllabus*

The defendant, who had been on probation as a result of prior criminal convictions, appealed from the trial court's judgment revoking his probation and sentencing him to eight years of incarceration. The defendant claimed, inter alia, that the court erroneously found him in violation of his probation when it relied on evidence the police seized during an inventory search of his vehicle and inculpatory statements he made to the police. *Held*:

This court declined to review, pursuant to *State* v. *Golding* (213 Conn. 233), the defendant's unpreserved claim that the trial court improperly relied on the warrantless seizure by the police of his cell phone and ammunition from his vehicle, as the record was inadequate to review that claim, the defendant having failed to raise any fourth amendment claim or request that the court exclude the evidence at the violation of probation hearing, and the court made no findings concerning the validity of the inventory search or whether the police had engaged in misconduct so as to warrant application of the exclusionary rule.

The record was inadequate for this court to review, pursuant to *Golding*, the defendant's unpreserved claim that the inculpatory statements he made while in police custody should have been excluded at the violation of probation hearing because he had not been advised of his rights under *Miranda* v. *Arizona* (384 U.S. 436) prior to questioning, as the trial court did not make any factual findings or legal conclusions as to whether the defendant had been in custody or subject to interrogation, the record was unclear as to whether he had been advised of his rights pursuant to *Miranda* and he did not seek to exclude the statements or raise a *Miranda* claim at the violation of probation hearing.

The evidence was sufficient for the trial court to find that the defendant violated his probation by engaging the police in a motor vehicle pursuit, evading responsibility in the operation of a motor vehicle and possessing a firearm in the vehicle, as the court's factual findings underlying those conclusions were not clearly erroneous.

The trial court's finding that the defendant violated his probation by possessing ammunition in his vehicle was clearly erroneous, as the presence of a passenger in the vehicle during the incident at issue meant that the defendant did not have exclusive control over the vehicle's interior, there was no evidence that he knew of the ammunition's character or presence in the vehicle, and the evidence was insufficient to support a finding of constructive possession.

This court determined that a new sentencing hearing was not required as a result of the trial court's erroneous finding that the defendant had possessed

ammunition in his vehicle, as the court made no mention of the ammunition during sentencing but focused instead on the seriousness of the conduct of the defendant, as a convicted felon, in possessing a firearm when he was on probation for the same offense, and the record was devoid of any indication that the sentence imposed may have been impacted by the court's erroneous finding so as to warrant a new sentencing proceeding.

The trial court did not abuse its discretion by revoking the defendant's probation and imposing a sentence of incarceration, as the court's determination that the beneficial purposes of probation were no longer being served was supported by ample evidence from which it reasonably could have determined that the defendant no longer was a good risk for continued probation because his behavior was adverse to his own rehabilitation and to the public's safety.

Argued February 18—officially released June 9, 2026

*Procedural History*

Information charging the defendant with violation of probation, brought to the Superior Court in the judicial district of Bridgeport and tried to the court, *McShane, J.*; judgment revoking probation, from which the defendant appealed to this court. *Affirmed.*

*Nicole P. Britt*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (defendant).

*Alexander A. Kambanis*, deputy assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Candace C. Solis*, assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Malcom Elton Dukes, appeals from the judgment of the trial court finding him in violation of, and revoking, his probation pursuant to General Statutes § 53a-32.[1] On appeal, the defen-

---

[1] General Statutes § 53a-32 provides in relevant part: "(a) At any time during the period of probation . . . the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation . . . .

* * *

"(c) Upon notification by the probation officer of the arrest of the defendant or upon an arrest by warrant as herein provided, the court

dant claims that the trial court erred in finding him in violation of his probation because, **(1)** in making that finding, the court improperly relied on certain evidence that should have been suppressed, namely, **(a)** evidence recovered from his vehicle following an inventory search of the vehicle conducted by the police, allegedly in violation of his fourth amendment rights, and **(b)** inculpatory statements he had made to the police, allegedly in violation of his *Miranda* rights,[2] and **(2)** the evidence was insufficient to establish that he violated his probation. The defendant also claims that the court abused its discretion in revoking his probation and sentencing him to eight years of incarceration. We decline to review both aspects of the defendant's first claim and disagree with his second claim, although we conclude that one of the four grounds on which the court found the defendant in violation of his probation was not supported by sufficient evidence. Moreover, because we are confident that the court's erroneous finding did not impact the sentence imposed, and because we conclude that the court did not abuse its discretion in revoking the defendant's probation

shall cause the defendant to be brought before it without unnecessary delay for a hearing on the violation charges. At such hearing the defendant shall be informed of the manner in which such defendant is alleged to have violated the conditions of such defendant's probation or conditional discharge, shall be advised by the court that such defendant has the right to retain counsel and, if indigent, shall be entitled to the services of the public defender, and shall have the right to cross-examine witnesses and to present evidence in such defendant's own behalf. . . .

"(d) If such violation is established . . . the court may . . . (4) revoke the sentence of probation . . . . If such sentence is revoked, the court shall require the defendant to serve the sentence imposed or impose any lesser sentence. Any such lesser sentence may include a term of imprisonment, all or a portion of which may be suspended entirely or after a period set by the court, followed by a period of probation with such conditions as the court may establish. No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by the introduction of reliable and probative evidence and by a preponderance of the evidence. . . ."

[2] Pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prior to a custodial interrogation, a criminal suspect must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

and imposing the eight year sentence of incarceration, we affirm the judgment of the court.

The following facts, which the court reasonably could have found, and procedural history are relevant to our resolution of this appeal. The defendant had been convicted in 2018, on a guilty plea, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and criminal possession of a firearm in violation of General Statutes § 53a-217, for which he had been sentenced to a total effective term of fifteen years of incarceration, execution suspended after seventy-eight months, followed by five years of probation.[3] The defendant's probationary period commenced on September 29, 2021. On two separate occasions—October 4 and November 4, 2021—he met with a probation officer and reviewed and signed the conditions of his probation. Those conditions included, inter alia, the standard condition that he not violate any criminal law of this state or the United States, and court-ordered special conditions that he, inter alia, not possess any weapons, ammunition, narcotics or drugs; pay restitution; submit to random urine tests; and maintain verifiable employment.

On October 10, 2023, the defendant was arrested by the Bridgeport police and charged with, inter alia, criminal possession of a firearm, ammunition or an electronic defense weapon in violation of § 53a-217, carrying a pistol without a permit in violation of § 29-35 (a) (1), illegal possession of a weapon in a motor vehicle in violation of General Statutes § 29-38, carrying a dangerous weapon in violation of General Statutes § 53-206, possession of a large capacity magazine in violation of General Statutes § 53-202w (c), violation of the deadly weapon registration requirements under General Statutes § 54-280a, possession of a weapon on school grounds in violation of

---

[3] A certified copy of the defendant's conviction record and the order of the defendant's probation were admitted into evidence at the violation of probation hearing.

General Statutes § 53a-217b, possession of more than the legal limit of cannabis in violation of General Statutes § 21a-279a (d) (1), engaging police in pursuit in violation of General Statutes § 14-223 (b), evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (b) (3), disobeying a signal of an officer in violation of § 14-223 (a), reckless driving in violation of General Statutes § 14-222, illegal operation of a motor vehicle while his registration or license was under suspension in violation of General Statutes § 14-215 (a), operating a motor vehicle without carrying an operator's license in violation of General Statutes § 14-213, illegal operation of a motor vehicle without minimum insurance in violation of General Statutes § 14-213b, and failure to obey a stop sign in violation of General Statutes § 14-301.

As a result of the defendant's arrest on those charges, he was arrested pursuant to a warrant dated December 1, 2023, and charged with violating his probation. A hearing was held before the court, *McShane, J.*, on August 26 and 27, 2024. During the evidentiary phase of the hearing, the state presented the following evidence in support of the violation of probation charge.

On the evening of October 8, 2023, Officer Roberto Rivera of the Bridgeport Police Department was working as a patrol officer in a marked patrol car when he observed a vehicle traveling at a high rate of speed. The vehicle, an orange Dodge Challenger (Challenger),[4] "hit a dip in the road, which caused the front of the vehicle [to] scrape in the front [and then move] in a motion as if it was going to go airborne, all the while accelerating." While the vehicle was accelerating, the driver of the Challenger failed to come to a complete stop at two intersections, after which Rivera activated his vehicle's emergency lights and siren and attempted to conduct a motor vehicle stop of the Challenger. The driver of the Challenger, however, accelerated at a high rate of speed and failed to come to a

---

[4]In the transcript of the violation of probation hearing, this vehicle also is referred to as a Dodge Charger, which is inaccurate.

complete stop at another intersection. Rivera's pursuit of the Challenger was recorded on a police dashboard camera, which was activated when Rivera engaged his vehicle's lights and siren. That recording was played during the hearing and admitted into evidence as state's exhibit five.

During his pursuit of the Challenger, Rivera observed the license plate number and ran it through his mobile police computer in his patrol car, which showed that the Challenger was registered to the defendant and that the registration of the vehicle was suspended due to insurance compliance issues. Rivera also provided the license plate number to police dispatch, which informed him of the defendant's address and that the Challenger's owner had a suspended driver's license. At that point, the Challenger had failed to come to a complete stop for a third time, and Rivera exercised his discretion to discontinue his pursuit of the Challenger. Rivera, instead, proceeded to the defendant's address, where he parked his vehicle and waited to see if the defendant would arrive there. After waiting several minutes, Rivera left and proceeded down Reservoir Avenue in a southerly direction to make his way toward police headquarters. As Rivera approached the intersection of Ortega and Reservoir Avenues, he observed a small crowd in the roadway. To his left, Rivera observed the orange Challenger that he had been pursuing. The Challenger appeared to have been in an accident, as it had gone through a fence and was resting in bushes on residential property. A still image of the accident scene involving the Challenger, taken from Rivera's body camera, was admitted into evidence as an exhibit.

Immediately upon his arrival at that scene, Rivera first made sure that everyone was safe and that no injuries had occurred. He then spoke with several witnesses who provided him with information, which he then relayed to police dispatch and to other officers who were canvassing the area. Thereafter, Rivera called for the fire department because the Challenger was emitting smoke and

was locked. There was no one inside the vehicle. After members of the fire department opened the vehicle and made it safe for towing, Rivera conducted an inventory search. During her direct examination of Rivera, the prosecutor asked whether the Bridgeport Police Department has a policy regarding inventory searches, to which Rivera responded, "[y]es." He explained that, when, as in this case, there is no driver or occupant present, "the vehicle gets towed," and "you do an inventory search of the vehicle and make sure there's no valuables inside of the vehicle" so that, if the owner does retrieve the vehicle, the owner cannot say that valuables were left in it that have disappeared. Rivera testified further that, pursuant to police department policy, he can look inside a vehicle's closed containers, such as the glove box, trunk and center console.[5] During his inventory search of the Challenger, Rivera located a cell phone on the front driver's side floor, a digital scale in the glove compartment, small sandwich bags on the rear passenger side floor, a black plastic bag with .45 caliber ammunition in it that was in the "[r]ear passenger seat, center console,"[6] and a plastic ziplock bag that had a "green-like substance in it." When

[5]During his cross-examination of Rivera, defense counsel briefly questioned him regarding the inventory search. First, counsel elicited testimony that Rivera had searched the Challenger prior to calling for a tow truck, without a warrant, and that his intent in conducting the search was to look for "[a]nything of value." Defense counsel then asked if it is "Bridgeport police policy to document what might be valuables in a car at the scene of an accident," to which Rivera responded, "[y]es." Defense counsel then asked whether "that's always the case" and whether Rivera ever waits "until the car is towed to a specific area," and Rivera responded that he could not "speak on other people" or about how things are done by other officers. Defense counsel then stated, "[s]o, your objective in going into the car with your flashlight and looking around is to look for valuables," and Rivera responded, "[c]orrect." No further questions were asked regarding the inventory search or any policies of the Bridgeport Police Department regarding such searches.

[6]When asked on cross-examination specifically where in the vehicle the ammunition was located, Rivera initially testified that it was "[i]n the rear seat *by* the center console." (Emphasis added.) After refreshing his recollection by viewing his police report, he clarified that it was found in the "[r]ear passenger seat, center console." By "center console," Rivera was referring to a compartment in the backseat of the vehicle.

Rivera picked up the cell phone, an image appeared on its lock screen wallpaper. A photograph was taken of the cell phone depicting the lock screen wallpaper image on October 9, 2023, and a copy of that image, which was a photograph of the defendant, as well as a photograph of the ammunition, were admitted into evidence without objection.[7]

In light of Rivera's discovery of the ammunition in the Challenger and the fact that no driver or other occupant of the vehicle was present, Rivera communicated via radio to other officers canvassing the area that the driver, who had fled the scene, might be in possession of a firearm or be attempting to dispose of one. Rivera also was contacted by an officer with a police intelligence gathering unit (intelligence unit) and was provided with information about the possible location of the firearm; as a result, Rivera walked toward the location. After moving a yellow garbage can, Rivera found a firearm between a fence and a pallet near a dumpster located on the property of an elementary school. Photographs of that area, along with a still photograph from Rivera's body camera of Rivera retrieving the firearm, were admitted into evidence as exhibits.[8]

The elementary school has exterior cameras that are monitored by the Bridgeport police. The school is located approximately one block from where the Challenger was found. A photograph depicting an aerial view of where the Challenger was located in relation to the elementary school was admitted into evidence. The police recovered video footage from the elementary school's cameras and from cameras facing the intersection where the accident involving the Challenger had occurred. A digital

---

[7]Photographs of the defendant that were taken during the booking process on October 8, 2023, also were admitted into evidence.

[8]Rivera testified that the firearm had a barrel of less than twelve inches and that it was loaded with thirteen rounds in the magazine. The firearm was put into an evidence bag and transported to police headquarters with the other evidence. The ammunition discovered in the Challenger was the same type of ammunition as the ammunition in the firearm in that both were .45 caliber.

video disc of that footage collected by the intelligence unit was admitted into evidence without objection and played at the hearing on August 26, 2024. That footage depicts two individuals leaving the scene of the accident and walking toward the elementary school. The surveillance footage from the side parking lot of the elementary school shows a male individual approaching a ramp at the elementary school and then running on the ramp with an object in his right hand that appears to be a firearm. In video footage from the exterior main entrance of the elementary school, the male figure can be seen running toward a dumpster at the end of an alleyway, moving a garbage bin that was adjacent to the dumpster and, after a few seconds, moving the garbage bin to its original position and then fleeing the area. Subsequently in the video footage, Rivera can be seen retrieving a firearm from that same area near the dumpster and garbage can at the elementary school and taking photographs of the firearm. Upon discovering the firearm, Rivera made it safe to handle "by taking the magazine out and making sure there [were] no rounds in the chamber." Rivera testified that the firearm was loaded, as he had found thirteen rounds in the magazine.

Still photographs taken from the video footage also were admitted into evidence. Rivera testified as to exhibit twenty-four, which shows the side parking lot of the elementary school, stating that "you could see a male individual on the school ramp holding a[n] object in his right hand." Rivera testified that exhibit twenty-three is a still photograph of the side parking lot of the elementary school "with the male party by the ramp," and stating that "what sticks out about this is his jeans have either reflective or white lining going straight down and the color of his [dreadlocks]." With respect to exhibit twenty-two, a still photograph of the same side parking lot of the elementary school, Rivera testified that it "shows the same male individual with what appears to be, in his right hand, a firearm that he is holding by the slide." Exhibit twenty-seven shows the defendant's clothing at the time he was apprehended; specifically, he

was wearing pants with a white stripe running vertically down the legs. Photographs of the defendant at the time of his arrest also were admitted into evidence and show that he has dreadlocks that are red and yellow in color.

Michael Bourke, a forensic science examiner with the DNA unit of the state forensics laboratory, testified regarding his testing of DNA swabs of the firearm[9] and magazine that had been submitted to the laboratory. The DNA found on the swab of the firearm generated a DNA profile that contained a mixture of DNA from five contributors. Bourke testified that "one of the contributors contributed considerably more DNA than the others," and was considered to be a "major contributor," and that he was able to develop a specific DNA profile for that contributor.[10] He entered that DNA profile into the Combined DNA Index System (CODIS) database,[11] which allows for a search against convicted offender samples in the database. A match was generated in the database, indicating that the forensic profile from the sample taken from the firearm "was a match to the offender DNA profile" from a sample submitted into the database that came from the defendant.

Officer Christopher Matarazzo of the Bridgeport Police Department testified regarding his assistance apprehending the defendant during the evening of October 8, 2023. Other officers had advised over the police radio

---

[9]Paul Nikola, a detective with the Major Crimes ID Forensic Unit of the Bridgeport Police Department, testified that he first examined the firearm for latent fingerprints but did not find any that were usable. Thereafter, he took DNA swabs of the firearm that were sent to the state laboratory for testing. He also test-fired the weapon and concluded that it functioned properly.

[10]Because there was no major contributor to the DNA sample taken from the magazine, no further testing was done with respect to that sample.

[11]" 'CODIS contains DNA profiles from unsolved crimes and compares them to known samples from convicted felons that are periodically added to the database. See, e.g., *State* v. *Webb*, 128 Conn. App. 846, 852–53 n.3, 19 A.3d 678, cert. denied, 303 Conn. 907, 32 A.3d 961 (2011).' *State* v. *Rodriguez*, 337 Conn. 175, 180 n.2, 252 A.3d 811 (2020)." *Jones* v. *Commissioner of Correction*, 212 Conn. App. 117, 133 n.4, 274 A.3d 237, cert. denied, 343 Conn. 933, 276 A.3d 975 (2022).

that they had observed a male matching a description that had been provided to them in the area of Funston Avenue and Soundview Avenue. The defendant was found near a house on Funston Avenue at about 11:45 p.m. Video footage from Matarazzo's body camera was admitted into evidence without objection and played during the hearing.[12] In the footage, Matarazzo asked the defendant, who was lying face down on the ground with his hands behind his back, to turn over, at which time the defendant stated, "I don't have no guns, bro. . . . I never had no guns. I was drinking, and I ran from you." The defendant also stated that he had "weed" on him that he had thrown away, that he had "crashed" and ran from the "orange car" because he had been drinking and "panicked," and that he was by himself at the time.

At the conclusion of Matarazzo's testimony, the prosecutor rested the evidentiary portion of the state's case. Thereafter, the court canvassed the defendant concerning his right to testify. The next morning, the defendant informed the court that he would not be testifying, and, after the court canvassed him further and questioned his counsel about that decision, the court made a finding that the defendant had knowingly and voluntarily waived his right to testify. Defense counsel did not call any witnesses during the evidentiary phase of the hearing.[13]

After hearing brief arguments from the prosecutor and defense counsel, the court made the following relevant findings. Specifically, the court first noted the five witnesses[14] who testified at the hearing and "found all

---

[12]Still photographs taken from the body camera footage also were admitted into evidence. Matarazzo testified that the photographs depicted what he was doing and what he saw when he captured the defendant, as well as the clothing worn by the defendant at the time of his capture, which included pants with a white stripe running vertically down the pant legs.

[13]During cross-examination of Bourke, defense counsel offered, and the court admitted, into evidence one exhibit, which consisted of a CODIS profile entry form relating to the swabs of the firearm.

[14]Marvin G. Saddler, the defendant's probation officer, also testified during the evidentiary portion of the hearing regarding the conditions of the defendant's probation and certain documents from the defendant's

the witnesses to be credible." It also noted the evidence presented by the prosecutor demonstrating that the defendant was on probation, that the defendant's probationary period began in October 2021, that the violation of probation warrant had been signed on December 5, 2023, and that the defendant had acknowledged and signed the written conditions of his probation.

The court found "by a fair preponderance of the evidence [that] the state ha[d] proven that the defendant, while on probation at the time, engaged in criminal conduct, specifically, [he] violate[d] the motor vehicle . . . and criminal laws of this state. The motor vehicle laws include . . . engaging a pursuit and evading responsibility." The court stated further: "And, there . . . certainly [was] circumstantial evidence that he, in fact, was the individual in that orange [Challenger] on the night of October 8, 2023. Specifically, I point to the following that indicates that he is the one: One, his cell phone was left behind, with [a photograph of him on the lock screen] . . . . [Y]ou look at it and it's, in fact, him. . . . [H]e admitted that he drove that car and was involved in an accident and left the scene. I will note that I know that counsel may dispute that with regard to a trial, with regard to a motion to suppress, but those were the statements that were made, probably—*although there's no evidence*—before any advisement of rights, but certainly they were made by the defendant at the time without being really questioned by the police. So, I find that the statements were voluntary and that the defendant admitted to violating the laws, at least of engaging and evading. . . .

"I think [that the] police do have a safety or a need to engage in what we call an inventory search, and that inventory search is to protect them, meaning the police, so someone doesn't claim, 'I had five gold bars in there, and now they're not there.' It's . . . to . . . [protect] the police from false claims of any property loss. It also

probation file that were admitted into evidence, which showed, inter alia, that the defendant had signed the written conditions of his probation on October 4 and November 4, 2021.

protects the police from anything that may be in there that's dangerous while the car is in police custody. So, as part of that search, the police found three bullets. . . .

"[W]e learned that, after the accident, two people left the orange Dodge Challenger. They're followed by city cameras to a school. I will note that the defendant's appearance in there—they're not the clearest videos in the world—but the appearance is consistent with the defendant. . . . [O]ne of the things I found perhaps most compelling was, if you look at the video, particularly when they're at the school on what, counsel, you've described as the ramp, the defendant's indications, his theatrics, so to speak—which I've noted in this court-room—throwing his hands around and the manner in which he held himself, his disposition, his demeanor certainly seems like the same person we have here in court. And I've seen him in court. I've seen him when there's answers that he doesn't like, when there's questions he doesn't like. His mannerisms, his gestures, are similar to that of what I saw on the video. Now, the police . . . put together [a] video of the individuals leaving the Challenger and going to the area of the school, and in that [area the] police were able to find a gun on the ground. It just so happens [that] the gun has . . . DNA [on it] that is consistent with a previous submission by the defendant, probably from this conviction. So, I find that the circumstantial evidence certainly indicates [that] the defendant violated the laws of this state, particularly possession of a weapon . . . to wit, a Glock pistol, [for] which the defendant would be in violation of his probation. I also find that possession of the bullets is also consistent with that.

"There was evidence with regard to a green, plant-like material that tested positive—there was no clear evidence whether it tested positive. I will not find that that is a violation of his probation or violation of a law, but I will find that there is substantial other evidence that indicates that the defendant engaged in criminal law violations while on probation." (Emphasis added.)

Thereafter, the court heard testimony from Marvin G. Saddler, the defendant's probation officer, after which the court made a determination that the goals of the defendant's probation were no longer being served, and it balanced the defendant's liberty interests against the need to protect the public. A sentencing proceeding was held on September 3, 2024. The court rendered judgment revoking the defendant's probation and sentenced him to a term of eight years of incarceration.[15] This appeal followed. Additional facts and procedural history will be set forth as necessary.

We first set forth our standard of review and legal principles governing violation of probation proceedings. A violation of probation hearing "involves two distinct components. Initially, the court conducts an adversarial evidentiary hearing to determine whether the defendant has indeed violated a condition of probation. . . . The state must establish a violation of probation by a fair preponderance of the evidence. . . . That is to say, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . This court will not disturb a trial court's factual determination that a violation has occurred unless that determination is clearly erroneous. . . .

"Second, if the evidence supports a violation, the court exercises its discretion and determines whether the beneficial, rehabilitative purposes of probation are still being served or whether the need to protect the public outweighs the probationer's interest in liberty. . . . Thus, an appellate court will affirm an exercise of discretion reinstating an original sentence or ordering incarceration, absent a manifest abuse of discretion or injustice requiring reversal." (Internal quotation marks omitted.) *State* v. *Dennis*, 237 Conn. App. 649, 656–57, 352 A.3d 204, cert. denied, 354 Conn. 932, 354 A.3d 728 (2026).

[15]We note that, although the record does not contain a written decision of the trial court, it does include a signed transcript of the court's oral decision. See Practice Book § 64-1 (a).

"The law governing the standard of proof for a violation of probation is well settled. . . . [A]ll that is required in a probation violation proceeding is enough to satisfy the court within its sound judicial discretion that the probationer has not met the terms of his probation. . . . [A] trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . This court has observed that to support a judgment of revocation of probation, [o]ur law does not require the state to prove that all conditions alleged were violated; it is sufficient to prove that one was violated." (Internal quotation marks omitted.) *State* v. *Owens*, 235 Conn. App. 482, 494–95, 345 A.3d 489 (2025). With these general principles and standards of review in mind, we turn to the defendant's claims on appeal.

I

On appeal, the defendant challenges the court's finding that he violated his probation and raises a number of grounds in support of his challenge, which we address in turn. The defendant also asserts that, to the extent that any of his claims are deemed unpreserved, this court should review any unpreserved claims pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

A

The defendant claims that the court, in finding that he violated his probation, improperly relied on certain evidence that should have been suppressed. Specifically, he claims that the cell phone and ammunition evidence recovered from the Challenger following Rivera's inventory search of the vehicle was obtained as a result of an illegal warrantless search of the vehicle in violation of his fourth amendment rights and, thus, should have been

excluded and should not have factored into the court's violation of probation findings.

The state counters in its appellate brief that the defendant did not preserve his claim that the ammunition and cell phone evidence recovered from the Challenger should have been excluded. The state further contends that the defendant should be deemed to have waived this claim due to his failure to seek to suppress this evidence at trial; that, even if the claim is not waived, the record is inadequate to review the claim pursuant to *Golding*; that the claim fails on its merits because there was no " 'egregious, shocking or harassing police misconduct' "; *State* v. *Maietta*, 320 Conn. 678, 686, 134 A.3d 572 (2016); involved in this case; and that any alleged error in the admission of the evidence was harmless, as sufficient other evidence in the record supported the court's violation of probation findings. We agree with the state that the defendant's claim is unpreserved, as the defendant did not request that the court exclude that evidence at the violation of probation hearing or raise any fourth amendment claim before the trial court. We also agree that the record is inadequate to review the defendant's unpreserved claim pursuant to *Golding*. Therefore, we decline to review this claim.

"Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: **(1)** the record is adequate to review the alleged claim of error; **(2)** the claim is of constitutional magnitude alleging the violation of a fundamental right; **(3)** the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and **(4)** if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Sidiropoulos*, 237 Conn. App. 262, 296, 351 A.3d 871, cert. denied, 354 Conn. 923, 353 A.3d 842 (2026). "[T]he inability to meet any one prong requires a determination that the defendant's claim must fail. . .

. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Nathan S.*, 236 Conn. App. 759, 812, 350 A.3d 544 (2025), cert. denied, 354 Conn. 931, 354 A.3d 728 (2026).

"The first *Golding* requirement is that the record be adequate to review the alleged claim of [constitutional] error . . . . The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim. . . . *State* v. *Burgos*, 170 Conn. App. 501, 546–47, 155 A.3d 246, cert. denied, 325 Conn. 907, 156 A.3d 538 (2017).

"[Connecticut] case law addressing whether a record is adequate for review under the first prong of *Golding* makes clear that this preservation exception operates in a very restrictive manner, particularly in the fact sensitive context of illegal search and seizure claims. *State* v. *Jenkins*, 298 Conn. 209, 227, 3 A.3d 806 (2010)." (Internal quotation marks omitted.) *State* v. *Overstreet*, 232 Conn. App. 273, 283, 337 A.3d 31, cert. denied, 352 Conn. 910, 336 A.3d 83 (2025).

The following legal principles are relevant to the defendant's claim regarding the evidence that should have been excluded at the violation of probation hearing. " '[T]he [f]ourth [a]mendment protects the right to be free from "unreasonable searches and seizures," but it is silent about how this right is to be enforced. To supplement the bare text, [the United States Supreme Court] created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a [f]ourth [a]mendment violation.' *Davis* v. *United States*, 564 U.S. 229, 231–32, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). As such, the exclusionary rule 'is a

prudential doctrine . . . created by [the][c]ourt to compel respect for the constitutional guarant[ee]. . . . Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. . . . The rule's sole purpose is to deter future [f]ourth [a]mendment violations.'" *State ex rel. Dunn* v. *Connelly*, 228 Conn. App. 458, 476, 325 A.3d 1159, cert. denied, 350 Conn. 933, 327 A.3d 386 (2024), cert. denied sub nom. *Connelly* v. *Connecticut*, U.S. , 146 S. Ct. 119, 223 L. Ed. 2d 20 (2025); see also *State* v. *Romero*, 199 Conn. App. 39, 50, 235 A.3d 644, cert. denied, 335 Conn. 955, 238 A.3d 731 (2020).

"[A] probation revocation proceeding [however] is civil in nature and, therefore, does not require all of the procedural components associated with an adversary criminal proceeding." (Internal quotation marks omitted.) *State* v. *Dunbar*, 233 Conn. App. 297, 310, 339 A.3d 642, cert. denied, 353 Conn. 913, 344 A.3d 155 (2025). "[U]nlike criminal trials, in which the exclusionary rule typically applies, in probation revocation hearings, the exclusionary rule typically does not apply. . . . Thus, a probationer has the burden of persuading us that the exclusionary rule should nonetheless apply. . . . *State* v. *Jacobs*, 229 Conn. 385, 392, 641 A.2d 1351 (1994); see also *Payne* v. *Robinson*, 207 Conn. 565, 571, 541 A.2d 504 (explaining that [t]he purpose of probation revocation proceedings is to determine whether a probationer is complying with the conditions of his probation and that, [i]n such proceedings, the government has an interest in accurate fact-finding that is likely to be impaired when otherwise reliable and relevant evidence is excluded), cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988). Our bar on the application of the exclusionary rule to probation revocation proceedings is not absolute . . . as egregious, shocking or harassing police misconduct would warrant our application of the rule to such probation proceedings. . . . *State* v. *Maietta*, [supra, 320 Conn. 686–87]." (Internal quotation marks omitted.) *State* v. *Sykes*, 232 Conn. App. 753, 763–64, 337 A.3d 1174, cert. denied, 353 Conn. 906, 343 A.3d 504 (2025).

In the present case, the defendant acknowledges that the exclusionary rule "typically does not apply to probation revocation hearings" but contends, nevertheless, that, under the circumstances of this case, an exception to that general rule applies because Rivera engaged in " 'egregious, shocking or harassing police misconduct' " when he performed an illegal inventory search of the Challenger. *State* v. *Maietta*, supra, 320 Conn. 686. In support of this claim, the defendant cites to various "general orders" of the Bridgeport Police Department (general orders), which consist of internal guidelines and procedures for Bridgeport police officers with respect to, inter alia, inventory searches of motor vehicles or the handling of an abandoned vehicle at an accident scene, and he included copies of those general orders totaling more than 100 pages in the appendix to his appellate brief. Relying on those general orders, the defendant contends that Rivera's inventory search of the Challenger was illegal because it was not conducted in accordance with those orders. The general orders on which the defendant relies in support of this claim, however, were not admitted as evidence at the violation of probation hearing. We, therefore, decline to consider them in this appeal. See, e.g., *State* v. *Owens*, supra, 235 Conn. App. 498 n.14 ("We decline to consider any evidence that was not before the court at the probation revocation hearing. See, e.g., *Dushay* v. *Southern Connecticut Hockey League, LLC*, 234 Conn. App. 609, 612 n.3, 344 A.3d 175 (2025). 'A reviewing court cannot go beyond the proper record before it in the determination of issues presented on appeal. . . . It is axiomatic that this court does not take evidence and does not make factual determinations.' . . . *State* v. *Dyous*, 153 Conn. App. 266, 278 n.10, 100 A.3d 1004 (2014), appeal dismissed, 320 Conn. 176, 128 A.3d 505 (2016).").[16]

---

[16]We find no merit to the defendant's assertion that, because this court exercises plenary review over the issue of whether the inventory search was legal, "this court can consider additional materials such as the Bridgeport police policies to determine whether the search was legally valid." First, this claim is premised on the erroneous assumption that the issue of whether Rivera conducted a legal inventory

In the present case, as we previously indicated, Rivera testified that he had performed an inventory search of the Challenger, which resulted in his finding the defendant's cell phone and the ammunition. During her direct examination of Rivera, the prosecutor asked whether the Bridgeport Police Department has a policy regarding inventory searches, to which Rivera responded in the affirmative. He explained that, when, as in this case, there is no driver or occupant present, "the vehicle gets towed," and "you do an inventory search of the vehicle and make sure there's no valuables inside of the vehicle" so that, if the owner does retrieve the vehicle, the owner cannot say that valuables were left in it that have disappeared. Rivera testified further that, pursuant to police department policy, he can look inside of a vehicle's closed containers, such as the glove box, trunk and center console. On cross-examination, defense counsel only briefly addressed the issue, asking whether it is "Bridgeport police policy to document what might be valuables in a car at the scene of an accident," to which Rivera responded, "[y]es." See footnote 5 of this opinion. No further questions were asked regarding the inventory search or any policies of the Bridgeport Police Department regarding such searches. That was the extent of any testimony at the violation of probation hearing concerning the policies of the Bridgeport Police Department with respect to inventory searches of vehicles, and no documentary evidence was offered concerning those policies.

"[Connecticut courts] consistently have declined to grant *Golding* review to [claims under the fourth amendment to the United States constitution] wherein the predicate factual record was not completely developed before the trial court. *State* v. *Jenkins*, supra, 298 Conn. 230; see also id., 223 (the defendant's failure to litigate the validity of the patdown during the suppression hearing

search of the Challenger is properly before this court. Furthermore, case law is clear that we, as a reviewing court, "cannot go beyond the proper record before [us] in the determination of issues presented on appeal," and that this court neither takes evidence nor makes factual determinations. (Internal quotation marks omitted.) *State* v. *Owens*, supra, 235 Conn. App. 498 n.14.

rendered the record inadequate for *Golding* review of this issue); *State* v. *Canales*, 281 Conn. 572, 582, 916 A.2d 767 (2007) (concluding that record was inadequate to review claim that defendant's statements were product of illegal arrest because the defendant did not argue at the suppression hearing that the arrest lacked probable cause, the state did not offer evidence concerning probable cause, and the trial court was not called upon to determine whether probable cause to arrest existed); *State* v. *Burgos*, supra, 170 Conn. App. 547–48 (concluding that record was inadequate to review defendant's fourth amendment claim because he did not contest the validity of his consent in his motion to suppress or at the suppression hearing)." (Internal quotation marks omitted.) *State* v. *Overstreet*, supra, 232 Conn. App. 285.

In *State* v. *Brunetti*, 279 Conn. 39, 56, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007), our Supreme Court determined that the record was inadequate to review the defendant's claim, made for the first time on appeal, that a search of his home was unconstitutional and, thus, that evidence found in the home should have been suppressed. Specifically, the defendant in *Brunetti* had claimed that, even though the search of his home was performed with the consent of his father, the search nonetheless was unconstitutional because his mother had declined to consent to the search. Id., 47. Our Supreme Court declined to review that claim, concluding that "the facts revealed by the record [were] inadequate to establish whether the alleged constitutional violation did, in fact, occur." Id., 64. In reaching that conclusion, the court stated that, "because the defendant's motions to suppress did not implicate the mother's consent or lack thereof, the state was not on notice that it was required to establish, on the basis of the totality of the circumstances, that the defendant's mother had consented to or acquiesced in the search. In such circumstances, the state bears no responsibility for the evidentiary lacunae, and, therefore, it would be manifestly unfair to the state for this court to reach the merits of the defendant's claim upon a mere

*assumption* that the defendant's mother had declined to consent to the search." (Emphasis in original; footnote omitted.) Id., 59.

In *State* v. *Overstreet*, supra, 232 Conn. App. 286, this court held, similar to *Brunetti*, that the record was inadequate to review the defendant's unpreserved claim that the trial court should have suppressed evidence of a machete due to the state's failure to establish that its seizure was proper under the plain view doctrine. In *Overstreet*, this court explained that, "[b]ecause the defendant did not raise issues related to the seizure of the machete at [a] suppression hearing [at which he sought to suppress other evidence], the state was not alerted to the need to develop a factual record concerning the application of the plain view doctrine." Id. As a result, "any decision by this court concerning the validity of the seizure [of the machete] would [have been] entirely speculative without the necessary factual and legal conclusions furnished by the trial court, [and] [was therefore] unreviewable under the first prong of *Golding*." (Internal quotation marks omitted.) Id., 288.

In the present case, the defendant never objected at the hearing to the admission of the evidence recovered from the Challenger, did not raise any claim before the trial court concerning the validity of the inventory search performed by Rivera, and failed to present any evidence concerning the procedures governing inventory searches performed by Bridgeport police officers. As a result, the state was not alerted to any claim regarding the validity of the inventory search or the need to develop a factual record relating thereto. "[I]n such circumstances, the state bears no responsibility for the evidentiary lacunae, and, therefore, it would be manifestly unfair to the state for [an appellate] court to reach the merits of the . . . claim . . . ." *State* v. *Brunetti*, supra, 279 Conn. 59. Also, the court made no findings concerning the validity of the inventory search or whether the police engaged in any kind of misconduct, let alone misconduct that could be construed as "egregious, shocking or harassing," so as

to warrant application of the exclusionary rule to this violation of probation proceeding.[17] (Internal quotation marks omitted.) *State* v. *Maietta*, supra, 320 Conn. 686–87. Thus, any decision by this court concerning the validity of the inventory search, or whether Rivera complied with police policies in conducting the search or engaged in any kind of misconduct, would be "entirely speculative without the necessary factual and legal conclusions furnished by the trial court . . . ." (Internal quotation marks omitted.) *State* v. *Overstreet*, supra, 232 Conn. App. 288.

Accordingly, the record is inadequate[18] to review the defendant's unpreserved fourth amendment claim concerning the exclusionary rule pursuant to *Golding*.[19]

[17]During defense counsel's arguments to the court at the conclusion of the evidentiary phase of the hearing, defense counsel briefly referenced the inventory search, questioning whether the police had a policy to safeguard property that is abandoned at an accident scene. The court responded and disagreed with defense counsel, stating that it believed that the police conduct inventory searches to protect themselves from false claims of property loss. Aside from that statement, the court made no further references with respect to the inventory search conducted by Rivera.

[18]We reject the defendant's contention that "the record is clear and adequate for review" because "[t]he trial court specifically stated that it found that there was a valid inventory search." We disagree that the court made a specific finding that the inventory search was valid. Rather, our review of the transcript demonstrates that the court made statements disagreeing with defense counsel's assertion that the police do not conduct inventory searches to protect against false claims of property loss. In making those few brief statements, the court did not discuss any specific policies or guidelines that the Bridgeport police must adhere to when conducting inventory searches or whether the inventory search conducted by Rivera was performed in accordance with police policies.

[19]We note that, even if we were to review the defendant's claim, it would fail on its merits, as the defendant has not directed this court to any evidence that would support a determination that Rivera engaged in egregious, shocking or harassing police misconduct, nor did the defendant provide any authority in support of his contention that a violation of internal police policies and guidelines concerning inventory searches would rise to the level of egregious, shocking or harassing police misconduct; therefore, the defendant failed to meet his burden of persuading this court that the exclusionary rule should apply in this case. See *State* v. *Sykes*, supra, 232 Conn. App. 763–64.

## B

Next, the defendant claims that his inculpatory statements to Matarazzo should have been excluded from evidence at the violation of probation hearing. Specifically, he contends that his statements admitting that he was the driver of the Challenger when it was involved in an accident were obtained in violation of *Miranda* because he made the statements while he was in police custody and under police interrogation, and he had not been advised of his *Miranda* rights prior to the questioning by the police.[20] Therefore, he asserts that the court should not have relied on those statements in finding that he was the operator of the Challenger and, in turn, finding that he violated his probation by engaging the police in a motor vehicle pursuit and evading responsibility in the operation of a motor vehicle.[21]

The state, again, contends that this claim is unpreserved, and we agree, as the video footage, with audio

[20]See *State* v. *Waters*, 214 Conn. App. 294, 330 n.21, 280 A.3d 601 ("Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . *State* v. *Gonzalez*, 302 Conn. 287, 294, 25 A.3d 648 (2011)." (Internal quotation marks omitted.)), cert. denied, 345 Conn. 914, 284 A.3d 25 (2022).

[21]The defendant has not provided this court with any authority indicating that the prophylactic rules set forth in *Miranda*, which are designed to protect an individual's privilege against self-incrimination under the fifth amendment and coerced confessions; see *Chavez* v. *Martinez*, 538 U.S. 760, 770, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003) (plurality opinion); *State* v. *Purcell*, 331 Conn. 318, 343, 359, 203 A.3d 542 (2019); apply to evidence presented in a violation of probation proceeding, or that evidence allegedly obtained in violation of *Miranda* may be excluded from a violation of probation proceeding if it involves " 'egregious, shocking or harassing police misconduct,' " as our Supreme Court held in *State* v. *Maietta*, supra, 320 Conn. 686, in the context of the exclusionary rule under the fourth amendment. Nevertheless, we need not address this issue because, even if we assume, without deciding, that such a claimed *Miranda* violation may properly be raised in a violation of probation proceeding, the claim suffers from the same infirmity—an inadequate record on which to review the claim—as the defendant's fourth amendment claim seeking to exclude the evidence obtained from the search of his vehicle, which precludes our review of the claim.

of the defendant's statements, from Matarazzo's body camera was admitted into evidence *without objection* and played during the violation of probation hearing, and the defendant never raised any claim of a *Miranda* violation before the trial court. The state also argues that the record is inadequate to review this unpreserved claim under *Golding* because the record was not sufficiently developed to support a finding as to whether the defendant had been provided with *Miranda* warnings. The defendant counters that, "because the state failed to provide any evidence that . . . proper *Miranda* warnings [were provided to him], the trial court was precluded from finding that they were given." According to the defendant, the court's finding that his statements were made voluntarily "require[d] an implicit finding that there were no *Miranda* warnings and that the defendant was in custody," which makes the record adequate for review of this claim. We do not agree with the defendant. Similar to our conclusion in part I A of this opinion, we conclude that the record is inadequate to review this unpreserved claim pursuant to *Golding*.

"For any *Golding* claim, [i]t is incumbent upon the [defendant] to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review. . . . Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative. . . . *State* v. *Brunetti*, [supra, 279 Conn. 63]. [W]e will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim. *State* v. *Golding*, supra, 213 Conn. 240." (Internal quotation marks omitted.) *State* v. *Leuders*, 225 Conn. App. 612, 641–42, 317 A.3d 69, cert. denied, 349 Conn. 920, 321 A.3d 402 (2024); see id., 642 (record was inadequate to review claim that defendant's statements, which defendant had sought to suppress, were not result of knowing and intelligent waiver of *Miranda* rights).

As we have indicated, the body camera footage that was admitted into evidence without objection shows the defendant's statements to Matarazzo on the evening of October 8, 2023, in which the defendant stated that he had been drinking and had "weed" on him, and that he had crashed the Challenger, panicked, and ran from the "orange car." In referencing the circumstantial evidence in support of its finding that the defendant was the driver of the Challenger on the night of October 8, 2023, the court pointed to the fact that his cell phone was left behind, with a photograph of him on the lock screen, and stated further: "[*H*]*e admitted that* he drove that car and was involved in an accident and left the scene. I will note that I know that counsel may dispute that with regard to a trial, with regard to a motion to suppress, but those were the statements that were made, probably— *although there's no evidence*—before any advisement of rights, but certainly they were made by the defendant at the time without being really questioned by the police. So, I find that the statements were voluntary and that the defendant admitted to violating the laws, at least of engaging and evading." (Emphasis added.)

As the trial court indicated, there was no evidence presented at the violation of probation hearing concerning when the defendant was advised of his *Miranda* rights, and the court stated only that the defendant "probably" had not been advised of his *Miranda* rights before he made the challenged statements. Thus, we do not agree with the defendant's contention that the record shows that he was not advised of his *Miranda* rights prior to when the police allegedly began to question him. Because the defendant's claim is predicated on his assertion that he was subjected to custodial police interrogation *without* having been advised of his *Miranda* rights, the record must demonstrate, in the first instance, that he, in fact, had not been advised of his *Miranda* rights prior to making the challenged statements. Such information, however, is absent from the record in this case. Nor did the court make any findings regarding whether the defendant was in custody or subject to interrogation.

In *State* v. *Morales*, 164 Conn. App. 143, 167–69, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016), this court declined to review an unpreserved *Miranda* violation claim under *Golding* due to an inadequate record. Although, in *Morales*, unlike in the present case, it was undisputed that the defendant did not receive *Miranda* warnings; id., 164; "the [trial] court was not asked to make, nor did it make, any factual findings or legal conclusions as to whether the defendant was in custody or subject to interrogation."[22] Id., 167. We explained: "Our Supreme Court has clarified that '[a] record is not inadequate for *Golding* purposes because the trial court has not reached a conclusion of law if the record contains the factual predicates for making such a determination.' *State* v. *Torres*, 230 Conn. 372, 378–79, 645 A.2d 529 (1994). Nevertheless, '[i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim.' . . . *State* v. *Hampton*, 293 Conn. 435, 443–44, 988 A.2d 167 (2009); see also *State* v. *Torres*, supra, 378 (*Golding* review unavailable where record lacks factual finding that forms basis of defendant's claim, not where record merely

---

[22]As we have stated, "[t]wo threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo. . . . *State* v. *Mitchell*, 296 Conn. 449, 459, 996 A.2d 251 (2010)." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 164 Conn. App. 165–66.

lacks factual determination regarding issue appealed).” *State* v. *Morales*, supra, 167. This court stated further: “[W]e do not know if all of the pertinent facts regarding the alleged interrogation and [the officer’s] conduct were elicited,” and that “[t]he state did not have the opportunity to present evidence to meet the defendant’s claim that his responses to [the officer] were inadmissible under the circumstances. More fundamentally, the record contains no findings by the court concerning whether the defendant was subject to interrogation for *Miranda* purposes. Even if we were to assume, without deciding, that the defendant was in custody when [the officer] handcuffed him . . . there is too scant a basis on which to determine whether the circumstances ‘reflect a measure of compulsion above and beyond that inherent in custody itself.’ . . . The defendant thus asks this court ‘to make a determination of fact that the trial court had not been asked to make.’ *State* v. *Torres*, supra, [379]; see *State* v. *Mullins*, [288 Conn. 345, 363–64, 952 A.2d 784 (2008)] (first prongs of *Miranda* custody and interrogation inquiries are factual) [overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013)]. Accordingly, the defendant’s claim is not reviewable under *Golding*.” (Citations omitted.) *State* v. *Morales*, supra, 168–69.

In the present case, the court did not make any factual findings or legal conclusions as to whether the defendant was in custody or subject to interrogation, and, additionally, the record is unclear as to whether he had been advised of his *Miranda* rights before he made the statements. Moreover, because the defendant did not seek to exclude his statements or raise his *Miranda* claim at the violation of probation hearing, the state was not alerted to the need to dispute this claim. Without the necessary factual determinations by the trial court concerning the defendant’s claimed *Miranda* violation, any decision by this court with respect to this claim would be entirely speculative, and it would be unfair to the state for this court to review the claim under the circumstances. See *State* v. *Brunetti*, supra, 279 Conn. 59 (when “the state

bears no responsibility for the evidentiary lacunae . . . it would be manifestly unfair to the state for [an appellate] court to reach the merits of the . . . claim"); *State* v. *Krzywicki*, 39 Conn. App. 832, 840, 668 A.2d 387 (1995) ("An adequate factual record is especially crucial when dealing with a claim that was not preserved at trial, since consideration is being sought for review of a claim for which we lack a trial court ruling. . . . Because the record presented by the defendant does not indicate when the defendant received his *Miranda* warnings, an adequate record for review of the claim does not exist." (Citation omitted; internal quotation marks omitted.)); see also, e.g., *State* v. *Berube*, 256 Conn. 742, 751, 775 A.2d 966 (2001) (declining to review unpreserved claim of *Miranda* violation under *Golding* due to inadequate record when record was not clear as to when defendant received *Miranda* warnings, as it was "essential to know" timing of defendant's conversations with police with respect to his receipt of *Miranda* warnings); see id., 751–52 (declining to infer that defendant received *Miranda* warnings prior to his conversations with police).

Accordingly, we decline to review this unpreserved claim pursuant to *Golding*.

C

The defendant's next claim is that there was insufficient evidence to find that he had violated his probation. Specifically, he contends that there was insufficient evidence to support the court's findings that he violated his probation by engaging the police in a motor vehicle pursuit and evading responsibility in the operation of a motor vehicle, and by possessing ammunition and a firearm. We disagree that the evidence was insufficient to support the court's finding that the defendant violated his probation, as three of the four grounds on which the court based its finding are supported by sufficient evidence. We conclude, however, that the evidence is insufficient to support the court's finding that the defendant violated his probation by possessing ammunition.

The following principles guide our resolution of the defendant's sufficiency of the evidence claims. "[A] defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . [F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial."[23] (Internal quotation marks omitted.) *State* v. *Daniels*, 228 Conn. App. 321, 326–27, 324 A.3d 820, cert. denied, 350 Conn. 926, 326 A.3d 248 (2024).

Because this claim "concerns the evidentiary phase and the trial court's factual finding[s] that the defendant violated his probation, we are guided by the standard of review applicable to that phase. . . . [As we have stated] a trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . Accordingly, [a] challenge to the sufficiency of the evidence is based on the court's factual findings. The proper standard of review is whether the court's findings were clearly erroneous based on the evidence. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is no evidence in the record to support [the court's finding of fact] . .

---

[23]We reject the defendant's contention that any evidence resulting from the allegedly illegal inventory search of his Challenger as well as his inculpatory statements allegedly obtained in violation of *Miranda* should not be taken into consideration in our assessment of the sufficiency of the evidence to support the trial court's findings that he violated his probation. See *State* v. *Waters*, 214 Conn. App. 294, 302, 280 A.3d 601 ("[e]stablished case law commands us to review claims of evidentiary insufficiency in light of all of the evidence [adduced at trial]" (internal quotation marks omitted)), cert. denied, 345 Conn. 914, 294 A.3d 25 (2022).

. or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Jordan*, 236 Conn. App. 168, 174–75, 347 A.3d 912 (2025), cert. denied, 354 Conn. 903, 349 A.3d 18 (2026). In determining whether a court's finding that a defendant violated the conditions of his probation is clearly erroneous, "it is not the role of this court to weigh the evidence presented or to evaluate the credibility of witnesses." *State* v. *Dennis*, supra, 237 Conn. App. 658.

"[E]vidence is not insufficient [merely] because it is conflicting or inconsistent. [The fact finder] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [fact finder's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [fact finder] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Sykes*, supra, 232 Conn. App. 769. "Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Chalupka*, 237 Conn. App. 781, 789, 354 A.3d 264, cert. denied, 354 Conn. 938,   A.3d   (2026).

1

With respect to the court's findings that the defendant violated his probation by engaging the police in a motor vehicle pursuit[24] and evading responsibility in the

[24]General Statutes § 14-223 (b) provides in relevant part: "No person operating a motor vehicle, when signaled to stop by an officer in a police vehicle using an audible signal device or flashing or revolving lights,

operation of a motor vehicle,[25] the defendant claims that, although he had made statements that he was alone in the Challenger, the video evidence, which the court noted was not clear, shows that there were two individuals leaving the area of the accident, and it cannot be determined from the video evidence which person was the driver. He further contends that, "[s]imply being in the car would not constitute a crime" and that, because "there [was] an equal likelihood that the other individual was the driver," the evidence was insufficient to demonstrate that he was the driver of the Challenger who had engaged the police in the pursuit and left the scene of the accident. We are not persuaded.

Central to the court's finding that the defendant violated his probation by engaging the police in a motor vehicle pursuit and evading responsibility in the operation of a motor vehicle was its determination that the defendant was the driver of the Challenger. The evidence supporting that finding includes the following.

First, the court had before it the defendant's own admissions at the time he was apprehended that he had driven the Challenger, was involved in an accident, and then fled the accident scene because he had been drinking

shall increase the speed of the motor vehicle in an attempt to escape or elude such police officer. . . ."

[25]General Statutes § 14-224 (b) (3) provides: "Each operator of a motor vehicle who is knowingly involved in an accident that causes injury or damage to property shall at once stop and render such assistance as may be needed and shall give such operator's name, address and operator's license number and registration number to the owner of the injured or damaged property, or to any officer or witness to the injury or damage to property, and if such operator of the motor vehicle causing the injury or damage to any property is unable to give such operator's name, address and operator's license number and registration number to the owner of the property injured or damaged, or to any witness or officer, for any reason or cause, such operator shall immediately report such injury or damage to property to a police officer, a constable, a state police officer or an inspector of motor vehicles or at the nearest police precinct or station, and shall state in such report the location and circumstances of the accident causing the injury or damage to property and such operator's name, address, operator's license number and registration number."

alcohol and panicked.[26] In addition, the cell phone recovered from the floor in front of the driver's seat was the defendant's cell phone, which the defendant does not contest on appeal; instead, he contends that "evidence that [his] cell phone was in the Challenger . . . does not indicate that he was the operator." We conclude that the fact that the defendant's cell phone was recovered from the floor in front of the driver's seat of the Challenger, which had just been pursued by the police and was involved in an accident, supports an inference that it fell there when the defendant fled from the driver's seat of the vehicle following the accident, and that inference was consistent with the defendant's statement acknowledging that he had been driving the vehicle. Moreover, the record shows that the defendant is the registered owner of the Challenger. See General Statutes § 14-107 (b) ("[w]henever there occurs a violation of section 10a-79, 10a-92, 10a-139, 14-218a, 14-219, 14-222, 14-223, 14-224 or 14-253a, or sections 14-275 to 14-281, inclusive, or a violation of an ordinance, bylaw or regulation of any town, city or borough in regard to parking, *proof of the registration number* of any motor vehicle therein concerned *shall be prima facie evidence in any criminal action* or in any action based on an infraction *that the owner was the operator thereof*, except in the case of a leased or rented motor vehicle, such proof shall be prima facie evidence in any criminal action that the lessee was the operator thereof" (emphasis added)).

In addition, Rivera testified about his pursuit of the Challenger before it was involved in the accident, including that he had observed the Challenger traveling at a high rate of speed and fail to come to a complete stop at two intersections. Rivera also testified that he had activated his vehicle's emergency lights and sirens and attempted to conduct a motor vehicle stop of the Challenger, which did not stop and, instead, accelerated at a high rate of speed and failed to come to a complete stop

---

[26]We note that the defendant acknowledges in his principal appellate brief that "the evidence shows that the defendant and another person were in the [Challenger] at the time of the accident."

at another intersection. The police dashboard camera video of that pursuit was admitted into evidence and corroborated Rivera's testimony.

We conclude that the evidence in the record is sufficient to support the court's finding that the defendant was the person who operated the Challenger. "Given our deferential review of the facts found by the trial court, and the applicable burden of proof, which requires that the evidence induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation"; *State* v. *Jordan*, supra, 236 Conn. App. 183; we further conclude that the court's findings that the state produced sufficient evidence to demonstrate by a preponderance of the evidence that the defendant had engaged the police in a motor vehicle pursuit and evaded responsibility in the operation of a motor vehicle, and thereby violated his probation, are supported by the record and are not clearly erroneous. See id., 183 n.9 ("all that is required in probation revocation hearing is that court is satisfied that probationer has not met terms of probation by preponderance of evidence and it is not required that proof of criminal conduct be sufficient to sustain criminal conviction").

2

In support of his claim that the evidence was insufficient to establish that he violated his probation by possessing the firearm[27] that was discovered near the dumpster at the elementary school, the defendant contends that, even though he was found to be a major contributor to the DNA found on the firearm, "DNA does

[27]General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm, ammunition or an electronic defense weapon when such person possesses a firearm, ammunition or an electronic defense weapon and (1) has been convicted of (A) a felony committed prior to, on or after October 1, 2013 . . . ."

The record in this case shows that the defendant, in 2018, was convicted on guilty pleas of the crimes of assault in the first degree in violation of § 53a-59 (a) (1), carrying a pistol without a permit in violation of § 29-35 (a), and criminal possession of a firearm, ammunition or an electronic defense weapon in violation of § 53a-217, all of which are felonies.

not have a time stamp," and there was "no evidence of when the defendant's DNA was transferred onto the gun." He further asserts that "DNA can be transferred in a variety of ways other than the defendant directly handling the gun" and that, because Rivera found the gun shortly after he had conducted a search of the defendant's Challenger, there was "a reasonable probability that Rivera had transferred the defendant's DNA onto the gun after searching the defendant's [Challenger]."[28] Finally, he argues, in the alternative, that the other occupant of the Challenger "may have possessed the gun while in the" vehicle and that the presence of his DNA, "without more," fails to establish his possession of the firearm. We disagree.

"The term [p]ossess means to have physical possession or otherwise to exercise dominion or control over tangible property . . . . General Statutes § 53a-3 (2). We have previously explained that there are two kinds of possession, actual and constructive. Actual possession requires the defendant to have had direct physical contact with the [contraband]. . . . Alternatively, constructive possession is possession without direct physical contact. . . . It can mean an appreciable ability to guide the destiny of the [contraband] . . . and contemplates a continuing relationship between the controlling entity and the object being controlled. . . . To establish constructive possession, the control must be exercised intentionally and with knowledge of the character of the controlled object. . . . A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . . General Statutes § 53a-3 (11).

"Moreover, [when] the defendant is not in exclusive possession of the premises where the [contraband is] found, it may not be inferred that [the defendant] knew of the presence of the [contraband] and had control of

[28]We note that the defendant did not present any evidence at the hearing demonstrating the various ways in which DNA can be transferred or suggesting that the DNA on the firearm was transferred there by Rivera or by another occupant of the Challenger.

[it], unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . Such evidence may include, for example, connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise . . . . Accordingly, although mere presence is not enough to support an inference of dominion or control, [when] there are other pieces of evidence tying the defendant to dominion [or] control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime. . . . [S]ee also *State* v. *Rhodes*, [335 Conn. 226, 241, 249 A.3d 683 (2020)] (some connection or nexus individually linking the defendant to the contraband is required . . .); *State* v. *Delossantos*, 211 Conn. 258, 278, 559 A.2d 164 ([p]resence alone, unilluminated by other facts is insufficient proof of possession . . .), cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). . . . *State* v. *Dawson*, 340 Conn. 136, 147–49, 263 A.3d 779 (2021). We emphasize, however, that mere [temporal and spatial] proximity to contraband, in the absence of other incriminating conduct, statements, or circumstances, is insufficient to support a finding of constructive possession. Id., 152; see also *State* v. *Porfil*, 191 Conn. App. 494, 527, 215 A.3d 161 (2019), appeal dismissed, 338 Conn. 792, 259 A.3d 1127 (2021); *State* v. *Nova*, 161 Conn. App. 708, 724, 129 A.3d 146 (2015)." (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 236 Conn. App. 185–87.

In the present case, Bourke testified, following his examination of the DNA swab of the firearm, that "one of the [five] contributors [to the DNA on the firearm] contributed considerably more DNA than the others" and was considered to be a "major contributor." Bourke was able to develop a specific DNA profile for that contributor, and he testified that the forensic profile from the sample taken from the firearm was a match with the offender DNA profile from a sample submitted into the database that came from the defendant. We conclude that

Bourke's testimony and the DNA evidence provided a sufficient nexus connecting the defendant to the firearm.

That nexus is further strengthened when the DNA evidence is considered in conjunction with other evidence in the record, including, inter alia, the video surveillance evidence, which also links the defendant to the firearm. Although the video footage depicts two individuals leaving the scene of the accident and walking toward the elementary school, the surveillance footage further shows a male individual approaching a ramp at the elementary school, running on the ramp with an object in his right hand that appears to be a firearm, then running toward a dumpster, where the individual moved a garbage bin back and forth and then fled the area. Subsequently in the video footage, Rivera can be seen retrieving a firearm from that same area near the dumpster and garbage bin at the elementary school and taking photographs of it. Also, photographs of the defendant's clothing at the time of his arrest showed that he was wearing pants with a white stripe that ran vertically down the legs, which was similar to the clothing worn by the individual in the surveillance videos from near the elementary school and the still photographs therefrom.

Notably, the court found, with respect to that video evidence, that the physical appearance and demeanor of the individual who walked from the accident scene to the elementary school was consistent with the defendant's appearance. In particular, the court stated: "[O]ne of the things I found perhaps most compelling was, if you look at the video, particularly when they're at the school on what, counsel, you've described as the ramp, the defendant's indications, his theatrics, so to speak—which I've noted in this courtroom—throwing his hands around and the manner in which he held himself, his disposition, his demeanor certainly seems like the same person we have here in court. And I've seen him in court. I've seen him when there's answers that he doesn't like, when there's questions he doesn't like. His mannerisms, his gestures, are similar to that of what I saw on the video. Now, the

police . . . put together [a] video of the individuals leaving the Challenger and going to the area of the school, and in that [area the] police were able to find a gun on the ground. It just so happens [that] the gun has . . . DNA [on it] that is consistent with a previous submission by the defendant, probably from this conviction."

Rivera also provided testimony, which the court found to be credible, that was consistent with the video surveillance evidence. For example, Rivera testified as to exhibit twenty-four, which shows the side parking lot of the elementary school, in which he stated that "you could see a male individual on the school ramp holding a[n] object in his right hand." Rivera testified that exhibit twenty-three is a still photograph of the side parking lot of the elementary school "with the male party by the ramp," and stating that, "what sticks out about this, is his jeans have either reflective or white lining going straight down and the color of his [dreadlocks]." With respect to exhibit twenty-two, a still photograph of the same side parking lot of the elementary school, Rivera testified that it "shows the same male individual with what appears to be, in his right hand, a firearm that he is holding by the slide." Consequently, we find no merit to the defendant's suggestion that the DNA evidence was the only evidence linking him to the firearm.

As we have stated, "[a]ll that is required in a probation violation proceeding is enough to satisfy the court within its sound judicial discretion that the probationer has not met the terms of his probation. . . . [A] trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation." (Internal quotation marks omitted.) *State* v. *Owens*, supra, 235 Conn. App. 494–95. In light of the evidence presented at the hearing in the present case, we are satisfied that it was sufficient to induce a reasonable belief in the mind of

the trier of fact that it was more probable than not that the defendant was the person who hid the firearm behind the dumpster and, thus, that he violated a condition of his probation by possessing the firearm. Therefore, the court's finding that the defendant violated his probation on this ground is not clearly erroneous.

3

With respect to his claim that there was insufficient evidence that he possessed the ammunition, the defendant contends that (1) there was no evidence that he actually possessed the ammunition in the Challenger, and (2) the evidence did not establish constructive possession, as there also was a female passenger in the vehicle,[29] and, because he "did not have exclusive control" of the backseat area within the Challenger where the ammunition was found, the "court could not infer that the defendant possessed it without additional evidence." We agree with the defendant that the evidence was insufficient to establish his constructive possession of the ammunition found in the Challenger, which consisted of three .45 caliber bullets.[30]

In *State* v. *Jordan*, supra, 236 Conn. App. 185–90, this court recently addressed a similar claim regarding the sufficiency of the evidence to support a finding that the defendant in that case had violated his probation by

[29]We note that the defendant contends on appeal that there also was a female passenger with him in the Challenger whose presence undermines any conclusion that he had exclusive possession and control of the ammunition in the backseat of the vehicle. See also footnote 26 of this opinion. The court stated in its decision that the video evidence shows that two people left the Challenger after the accident.

[30]We note that the court's finding that the defendant violated his probation by possessing ammunition, and the defendant's claim challenging the sufficiency of the evidence to support that finding, relate to the three bullets that were recovered from the rear seat of the Challenger and not to the ammunition recovered from the firearm. See *State* v. *Williams*, 352 Conn. 104, 136, 335 A.3d 792 (2025) ("defendant's conviction of both criminal possession of a firearm and criminal possession of ammunition [recovered from the firearm], in the absence of a clearly discernable legislative intent for multiple convictions under § 53a-217 (a) (1), is barred by the double jeopardy clause").

constructively possessing illegal drugs and a firearm located directly behind him in the rear seat area of a vehicle that he and another person occupied. In concluding that the evidence was insufficient to support a finding that the defendant possessed the contraband, this court stated: "First, we note that, if the contraband is found in a place where the defendant does not have exclusive possession, the presence of the defendant near the contraband without more is insufficient to support an inference of possession. *State* v. *Nova*, supra, 161 Conn. App. 719; see also *State* v. *Williams*, 110 Conn. App. 778, 785–86, 956 A.2d 1176 (mere presence is not sufficient to support inference of dominion and control when illegal drugs are found in area where defendant does not have exclusive possession and other pieces of evidence were necessary to establish that defendant knew substance in question was drug, knew of its presence, and exercised dominion and control of it), cert. denied, 289 Conn. 957, 961 A.2d 424 (2008). Additionally, we emphasize that, [t]o mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband. . . . *State* v. *Gainey*, 116 Conn. App. 710, 721, 977 A.2d 257 (2009). The state was required to prove that the defendant exercised dominion and control over the [contraband], in addition to knowledge of [its] presence and character." (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 188–89. This court further explained that "there was nothing in the record to support the finding that [the defendant] exercised dominion and control over the contraband. Its presence near him inside the vehicle, without more, does not meet the necessary threshold to support the court's finding that he violated his special conditions of probation. Simply stated, there was no evidence that connected the defendant with possession of the contraband found inside the vehicle." Id., 193.

In the present case, the evidence shows, and the court found, that two people had walked away from the Challenger after the accident. The presence of the second

individual means that the defendant did not have exclusive control over the interior of the vehicle. Significantly, unlike the cell phone, which was recovered from the floor in front of the driver's seat of the Challenger, the ammunition was recovered from the rear center console of the vehicle. As a result, the state needed to present evidence showing more than just the defendant's presence in the vehicle, namely, that "the defendant exercised dominion and control over the [contraband] . . . in addition to knowledge of [its] presence and character." Id., 189. The only evidence presented by the state on this issue demonstrated that the ammunition found in the Challenger was of the same caliber as the ammunition in the firearm that was recovered and that the defendant was found to have possessed. Although we have determined that the state presented sufficient evidence establishing a nexus between the defendant and the firearm, we cannot reach the same conclusion with respect to the ammunition in the Challenger. The record in this case does not contain any evidence to support a finding that the defendant exercised dominion and control over the ammunition recovered from the Challenger, or knew of its character or presence in the vehicle. Although we recognize that there is a lower standard of proof in a violation of probation proceeding, we nonetheless conclude that, "in the absence of other incriminating conduct, statements, or circumstances, [the evidence in the record] is insufficient to support a finding of constructive possession."[31]

---

[31] We note that the state relies on *State* v. *LaVoie*, 158 Conn. App. 256, 278, 118 A.3d 708, cert. denied, 319 Conn. 929, 125 A.3d 203 (2015), cert. denied, 578 U.S. 906, 136 S. Ct. 1519, 194 L. Ed. 2d 604 (2016), in support of its assertion that the evidence showing that the ammunition found inside the abandoned Challenger was of the same caliber as the ammunition discovered inside the firearm that the defendant had discarded by the elementary school was sufficient to support the court's finding that the defendant possessed the ammunition inside the Challenger. We find that the state's reliance on *LaVoie* is misplaced.

In *LaVoie*, this court addressed a claim that the prosecutor had mischaracterized evidence by stating that a shell casing " 'matche[d]' " shell casings of bullets that the defendant had purchased at a sporting goods store, which the defendant claimed conflicted with testimony of a state police officer that the shell casing was " 'consistent with' the shell casings

*State* v. *Dawson*, supra, 340 Conn. 152; see also *State* v. *Jordan*, supra, 236 Conn. App. 193.

Accordingly, we conclude that the court's finding that the defendant violated his probation by possessing ammunition is clearly erroneous.

Having reached that conclusion, we now must determine whether it requires a new sentencing proceeding. The defendant argues that, "if this court finds that . . . there was insufficient evidence to sustain any of the trial court's bases for the violation, the matter should be remanded for further proceedings regarding the defendant's sentence." Under the circumstances of this case, we do not agree.

As we have concluded, the state presented sufficient evidence from which the court reasonably could have concluded that the defendant had violated his probation by engaging the police in a motor vehicle pursuit, evading responsibility in the operation of a motor vehicle, and possessing a firearm. Our determination that there was insufficient evidence to support the court's finding that the defendant had violated his probation by possessing the ammunition in the Challenger requires us to examine the record to determine whether the court's erroneous finding had any bearing on the sentence imposed. See *State* v. *Benjamin*, 299 Conn. 223, 231–32, 9 A.3d 338 (2010); see also *State* v. *Jordan*, supra, 236 Conn. App. 196 ("we cannot be confident that the trial court would not have exercised its discretion differently in the dispositional phase had it sentenced the defendant solely on the basis of violations of probation for which there

---

of the bullets the defendant had purchased." Id., 277. This court found no impropriety with the prosecutor's use of the word " 'matche[d]' " and stated further that "the other evidence introduced at trial, *including the timing of the purchase and the caliber of the bullets*, was sufficient to support a finding that the bullet shot from the rifle that struck the victim was one of the bullets that the defendant purchased from [the sporting goods store]." (Emphasis added.) Id., 278. Thus, this court, in making that statement, did not rely on the caliber of the bullets alone, and it also bears noting that the statement was not made in the context of analyzing a sufficiency of the evidence claim.

was sufficient evidence in the record"); *State* v. *Sykes*, supra, 232 Conn. App. 779–80 (same); see also footnote 32 of this opinion.

In the present case, in revoking the defendant's probation, the court stated: "[T]he important interests in the probationer's liberty and rehabilitation must be balanced against the need to protect the public. The ultimate question, as our appellate [courts] . . . [have] indicated, is whether the probationer is still a good risk . . . . And, in this case, the answer is a loud and resounding no, he is not a good risk. In finding [that] the defendant's probation can be revoked, the court can continue probation, modify or enlarge the conditions of probation, extend the probation up to the statutory maximum, or revoke the sentence of the probation. The court may also . . . terminate the probation. Based upon the totality of the circumstances of this case, including similar conduct to what he was convicted of—that is, a weapon—including the fact that he was on probation, he was violated, it was wrapped into this probation, and now he's violated again, based on the fact that there was a new arrest and based on the seriousness of those offenses—it's not simply a motor vehicle offense, it's not a disorderly conduct, *but possession of a pistol by someone who's prohibited to carry one*, not just because of a license or lack of [a] license but the fact that he has a felony conviction—the fact that this was, as I indicated, a serious case and he is not compliant with the restitution; sure, he wasn't the worst probationer that ever came and reported to the Office of Adult Probation, but his noncompliance with treatment was evident in . . . Saddler's testimony. [The defendant] did not report as directed, although he did report eventually, so to speak. The court finds that the defendant is no longer—that the goals of probation are no longer being carried out—and will find him in violation [of his probation] . . . ." (Emphasis added.)

In the sentencing proceeding on September 3, 2024, the court imposed its sentence, stating: "[The defendant] has demonstrated throughout two probationary periods, as well as his appearances here in court, that he's not

able to conform with regulations and rules that are set forth for him. I want to make it clear that my sentencing today comes from a lot of factors . . . including a packet that [defense] counsel has provided . . . [which included various letters from family members] . . . . It also includes letters from—that indicate that the defendant has been employed and the various areas in which he's been employed . . . . These are all jobs I know that he did—look, the defendant was able to secure employment, given his record, given the fact that this is a difficult time, just immediately post-COVID. . . . [T]he defendant was able to have—secure not just one, but sometimes two jobs during the time period.

"So, I have taken all that into consideration. I've also taken into consideration the letters that are very well written on his behalf. . . . I have looked at the [presentence investigation report], I have considered the previous cases; I have considered, so to speak as they say in criminal courts, the totality of circumstances, including the person and his criminal record and the . . . charges. He had a previous violation of probation, which he failed to pay restitution and that was rolled in, so to speak, to this one, but I didn't see really anything in his record, anything in [the presentence investigation report] . . . that was redeeming. In fact, one of the only times that [the defendant] is not committing crimes is when he's locked up. For that, I think the appropriate sentence is a significant amount of time, and the . . . court will sentence him to a sentence of eight years to serve, and [order] that probation is terminated thereafter."

Our review of the court's remarks leads us to conclude that, even though the court's sentence was based on a number of factors, the court focused on the defendant's possession of a firearm when he was prohibited from carrying one due to his prior felony convictions, as well as the fact that the defendant had violated his probation by engaging in similar conduct—criminal possession of a firearm—of which he previously had been convicted and for which he was on probation. Nowhere in the court's

remarks did the court reference the three bullets recovered from the Challenger or the defendant's possession of ammunition as a basis for its sentence. As a result, we are not left with the impression that the court's sentence "may have been impacted" by its erroneous finding that the defendant had violated his probation by possessing ammunition. (Emphasis omitted.) *State* v. *Sykes*, supra, 232 Conn. App. 779. For that reason, the present case is distinguishable from *Sykes* and *Jordan*, in which this court could not be confident that the trial court would not have exercised its discretion differently in the dispositional phase had it sentenced the defendant solely on the basis of violations of probation for which there was sufficient evidence in the record. See id., 779–80; see also *State* v. *Jordan*, supra, 236 Conn. App. 196. In *Jordan*, for example, the trial court made remarks at sentencing that specifically referenced the basis of an erroneous finding by the court that the defendant had violated his probation by possessing contraband found inside a vehicle. See *State* v. *Jordan*, supra, 196.

Likewise, in *Sykes*, we concluded that there was insufficient evidence to support the trial court's finding that the defendant violated the condition of his probation requiring him to take a polygraph examination; see *State* v. *Sykes*, supra, 232 Conn. App. 777–78; and we determined that resentencing was necessary because "the court's dispositional determination may have been impacted by" its erroneous conclusion that the defendant violated his polygraph condition. (Emphasis omitted.) Id., 779. We reached this determination in light of certain comments by the trial court indicating that its dispositional determination was based, in part, on its conclusion "that the defendant had been 'researching' [case law] . . . in a possible attempt to '[build] a defense' for refusing to take [an] EyeDetect examination"; id.; which was being used in lieu of a polygraph examination by a treatment center the defendant had attended. Id., 757. This court concluded that the trial court's statements "suggest[ed] that it may have viewed the defendant's refusal to 'take a polygraph examination [or] its equivalent' as bad faith

misconduct warranting the imposition of a more severe sentence than he might otherwise have received."[32] Id., 779.

In contrast, in the present case, the court made no reference to the three bullets recovered from the Challenger during its remarks in the dispositional phase of the proceeding but, rather, focused on the seriousness of the conduct of the defendant, a convicted felon, in possessing a firearm, especially when he was on probation for the same offense, which the court found warranted a sentence that included "a significant amount of time . . . ." The record is devoid of any indication that the sentence

[32]Similarly, in *State* v. *Johnson*, 75 Conn. App. 643, 658–61, 817 A.2d 708 (2003), this court set aside a sentence imposed on the defendant for violating his probation and remanded the case for resentencing on the basis of an irregularity discovered in the defendant's conditions of probation form. In *Johnson*, the defendant argued, and this court agreed, that he should not be penalized for his refusal to sign a binding document that improperly exemplified the orders of the court. After invoking plain error review of the defendant's claim, this court examined the "court's reasons for revoking the defendant's probation and sentencing him to serve the entire three year suspended portion of his sentence." Id., 659. In doing so, this court noted that, "[d]uring the sentencing phase of the defendant's violation of probation proceeding, the court specifically stated that 'it is evident to me that if you [the defendant], in fact, had abided by the curfew [imposed as a condition of his probation] that we might not even, in fact, be here today, yet *there is a reason for the violation because up to that point you had refused to sign the conditions, which alone might have well constituted a violation of your probation.*' " (Emphasis in original.) Id. We concluded that the court's statement indicated that it "took into consideration, with much emphasis, the defendant's continued refusal to sign the conditions of probation form." Id. Accordingly, this court concluded that, "[b]ecause the court in the revocation proceeding specifically mentioned and took into consideration the defendant's repeated refusal to sign [those] forms, which incorrectly exemplified the court's own order, we have no way of determining whether the court, in exercising its discretion, would have imposed the same sentence if the defendant had, in fact, signed those forms or if they were not an issue in the proceeding," which we determined undermined "[t]he fairness, integrity and public confidence in the judicial process . . . ." Id., 660–61. Thus, in *Johnson*, as in *Jordan* and *Sykes*, this court did not automatically remand the case for resentencing after finding an error in the court's judgment but, rather, we examined the record, namely, the court's statements, in an effort to determine what impact, if any, the error had on the court's sentence.

imposed "may have been impacted" by the defendant's possession of the three bullets in the Challenger so as to warrant a new sentencing proceeding. (Emphasis omitted.) *State* v. *Sykes*, supra, 232 Conn. App. 779.

## II

The defendant's final claim is that the court abused its discretion in revoking his probation and sentencing him to eight years of incarceration. We do not agree.

The following additional facts are relevant to this claim. During the dispositional phase of the violation of probation hearing, the prosecutor recalled Saddler, the defendant's probation officer, to the witness stand. Saddler testified concerning the condition of the defendant's probation that he pay restitution and that, of the $2700 owed in restitution, the defendant did not make any payments. Saddler also testified that the defendant was supposed to receive a tax return from which he could have made payments but that, instead, the defendant wanted to use those funds to purchase a Mercedes-Benz vehicle. Saddler testified further that, in another instance in which the defendant received money, the defendant stated that he was going to use it to buy veneers instead of making the restitution payments. Saddler also testified regarding the defendant's work history, his failure to report for intakes for substance abuse treatment, his eventual discharge from facilities to which he had been referred due to lack of attendance, and his failures to report for office visits with his probation officer. The prosecutor asked Saddler if he had "formed an opinion as to whether or not the beneficial aspects of probation would be served if [the defendant] were continued on probation," and Saddler responded: "At this time, I don't think [that the defendant] is amenable to probation based on his new arrest, based on his noncompliance with the number one condition of probation, as well as his noncompliance with the court-ordered conditions of probation." Saddler acknowledged on cross-examination that he had been told by another probation officer that the defendant had purchased the Mercedes-Benz vehicle

and that Saddler never saw it for himself. After Saddler's testimony concluded and he was excused, defense counsel indicated to the court that he would not be presenting any witnesses, but that he had letters from some of the defendant's family members that he wanted the court to take into consideration in sentencing the defendant. The court stated that it would not sentence the defendant at that time.

Thereafter, the court stated that it had "to make a determination [of] whether the goals of probation [were being served], including whether [the defendant's behavior was] inimical to [his] own rehabilitation, as well as to the safety of the public." The court balanced "the important interests in the [defendant's] liberty and rehabilitation . . . against the need to protect the public," and determined that the defendant no longer was a "good risk . . . ." On the basis of the totality of the circumstances, the court concluded that the goals of probation no longer were being carried out. In reaching that conclusion, the court emphasized that this is a "serious case" that did not simply involve motor vehicle offenses, and highlighted the fact that the defendant was found to be in possession of a firearm when he was prohibited from carrying one due to his prior felony convictions. In the subsequent sentencing proceeding on September 3, 2024, the court imposed its sentence of eight years of incarceration.

We review a trial court's decision following the sentencing phase of a revocation of probation hearing under the abuse of discretion standard. See, e.g., *State* v. *Dennis*, supra, 237 Conn. App. 663. "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [if] an abuse of discretion is manifest or where injustice appears to have been done. . . . On the basis of its consideration of the whole record, the trial court may continue or revoke the sentence of probation . . . [and] . . . require the defendant to serve the sentence imposed or impose any lesser sentence. . . . In making this second determination, the trial court is vested with broad

discretion. . . . In determining whether to revoke probation, the trial court shall consider the beneficial purposes of probation, namely rehabilitation of the offender and the protection of society. . . . The important interests in the probationer's liberty and rehabilitation must be balanced, however, against the need to protect the public." (Internal quotation marks omitted.) Id.

At the outset, we note that the defendant argues on appeal that the court abused its discretion in revoking his probation and sentencing him to eight years to serve because the search of his Challenger was illegal and involved gross police misconduct and, thus, that the contraband found in the vehicle should have been excluded; that his inculpatory statements were elicited in violation of *Miranda* and should have been excluded; and that there was insufficient evidence to substantiate the four different grounds on which the court based its violation of probation findings. He contends that, if we agree with any of those claims, the matter should be remanded to the trial court for resentencing. Because we already have addressed and either rejected or declined to review these claims, we do not address them further in our review of the defendant's claim concerning the court's dispositional decision to revoke his probation and to sentence him to eight years of incarceration.

The defendant further contends that "the evidence shows that [he] maintained contact with probation throughout [his] probationary period," rescheduled any missed appointments, and maintained work during his probation period, which occurred during the time of the COVID-19 pandemic. He asserts that his "liberty interest in avoiding incarceration and capacity for rehabilitation, when balanced with public safety, should merit him the opportunity to continue his rehabilitative efforts on probation. Thus, the court abused its discretion in imposing a significantly long incarceration in this case." We do not agree.

The record in this case reveals that the court carefully considered the relevant factors and, in deciding to

revoke the defendant's probation, properly considered the beneficial purposes of probation and balanced the defendant's interests in liberty against the need to protect the public. In reaching its determination that the beneficial purposes of the defendant's rehabilitation were no longer being served, the court had before it evidence demonstrating that the circumstances of this case involved conduct that was similar to what the defendant previously had been convicted of and for which he was on probation. The court also noted that the defendant's new arrest was not simply for motor vehicle violations, but for serious offenses, including possession of a firearm by a convicted felon who is prohibited from carrying one. Other evidence that factored into the court's decision was the defendant's failure to comply with the condition of restitution, his noncompliance with treatment, and the fact that he did not report to probation as directed, although "he did report eventually . . . ." Thus, the court did take into consideration the fact that the defendant ultimately attended appointments that had been missed. Its determination that the beneficial purposes of rehabilitation were no longer being served was amply supported by the record.

With respect to the sentence imposed, the court found that the evidence demonstrates that the defendant is not able to "conform with regulations and rules that are set forth for him." After taking into consideration letters submitted on behalf of the defendant, as well as his employment record while on probation and the presentence investigation report, and finding that "one of the only times that [the defendant] is not committing crimes is when he's locked up," the court determined that eight years of his remaining eight and one-half years of incarceration was an appropriate sentence.

It appears that the defendant would like this court to reweigh the evidence and reach a different conclusion, which we cannot do. See, e.g., *State* v. *Gamer*, 215 Conn. App. 234, 249, 283 A.3d 16 (2022) ("[w]e will not substitute our judgment for that of the trial court"), appeal dismissed, 348 Conn. 331, 304 A.3d 146 (2023)

(certification improvidently granted). Moreover, the fact that the court imposed a lengthy sentence that comprised most of the defendant's unexecuted sentence did not, by itself, constitute an abuse of discretion. See, e.g., *State* v. *Santos T.*, 146 Conn. App. 532, 535, 77 A.3d 931 ("On the basis of its consideration of the whole record, the trial court may continue or revoke the sentence of probation . . . [and] . . . require the defendant to serve the sentence imposed or impose any lesser sentence. . . . In making this second determination, the trial court is vested with broad discretion." (Internal quotation marks omitted.)), cert. denied, 310 Conn. 965, 83 A.3d 345 (2013); see also *State* v. *Greene-Pendergrass*, 228 Conn. App. 695, 700, 324 A.3d 239 (2024) (trial court did not abuse its discretion in revoking defendant's probation and imposing sentence requiring defendant to serve five years of five years and four months unexecuted portion of his sentences).

"[T]he ultimate question [in the probation process is] whether the probationer is still a good risk . . . . This determination involves the consideration of the goals of probation, including whether the probationer's behavior is inimical to his own rehabilitation, as well as to the safety of the public." (Internal quotation marks omitted.) *State* v. *Hill*, 256 Conn. 412, 427, 773 A.2d 931 (2001). In the present case, on the basis of the evidence presented, the court reasonably could have determined that the defendant no longer was a " 'good risk' " because his behavior was adverse to his own rehabilitation and to public safety. See id. Affording every reasonable presumption in favor of the correctness of the court's decision and, on the basis of this record, we conclude that the court did not abuse its discretion in revoking the defendant's probation and sentencing him to eight years of incarceration, which was within its discretion to impose. See *State* v. *Santos T.*, supra, 146 Conn. App. 535.

The judgment is affirmed.

In this opinion the other judges concurred.